IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LUCIUS MANNING, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:10-cv-925-MEF |
| | ) | [WO – Do Not Publish] |
| JOE MOORE, in his individual capacity, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Lucius Manning ("Plaintiff" or "Luke") and Angela McCaw ("Ms. McCaw") filed a Second Amended Complaint (Doc. # 41) alleging numerous causes of action against Dale County Deputy Sheriff Joe Moore regarding a law enforcement encounter during which Deputy Moore tased Manning. The case is now before the Court on Deputy Moore's fully-briefed motion for summary judgment. (Docs. # 51, 52, 53, 56, 59, 66, 71.) After thorough consideration of the arguments of counsel, including the attached evidentiary submissions, as well as the relevant law, the Court finds that Defendant Joe Moore's Motion for Summary Judgment (Doc. # 51) is due to be GRANTED.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights) and 1367 (supplemental). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." ).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quotation omitted).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

If the movant satisfies its evidentiary burden, the non-moving party must then establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); Fed. R. Civ. P. 56(c).  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of*

*the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation and internal quotation marks omitted).

A genuine dispute as to a material fact can be found only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Greenberg*, 498 F.3d at 1263.  However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 242 (citations omitted).  Likewise, "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment[,]" *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Furthermore, a nonmoving party's "conclusory allegations . . . in the absence of supporting evidence, are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact . . . .") (emphasis in original).

When a nonmovant fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

On summary judgment, the facts must be viewed in the light most favorable to the non-movant. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Hence, "'facts as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

## III. BACKGROUND

The submitted evidence, construed in the light most favorable to Plaintiff, establishes the following facts:

On Sunday evening, November 16, 2008, City of Enterprise Police Department ("EPD") Detective Christopher Mason's ("Mason") investigation concerning a person impersonating a peace officer (a Class C felony under Alabama law, *Ala. Code* § 13A-10-11) led him to Plaintiff's residence.[1] (Mason Decl. (Doc. # 53-7).)

---

[1] James Kowalczyk, Plaintiff's brother-in-law and next door neighbor (Pl. Dep. 78 (Doc. # 53-3)), appears to have been the initial suspect. In his deposition, Mr. Kowalczyk recalled that he was attempting to return some shoes he had purchased when someone in the store recognized him as matching the description of a person who had been impersonating an officer. Detective

At some point either before or shortly after his arrival at Plaintiff's residence, Detective Mason requested the assistance of fellow EPD Lieutenant Robert S. Breed ("Lt. Breed") and Dale County Deputy Sheriff Joe Moore ("Deputy Moore").  (Breed & Moore Affs. (Docs. # 53-5, -6).)  Upon his arrival, Detective Mason's interest was piqued by the Ford Crown Victoria in Plaintiff's front yard, and he entered onto Plaintiff's property and began snapping photographs of the car and inspecting both the exterior and opening the door to examine the interior.[2]  (Kowalczyk Dep. 88, 89.)

By this time, Plaintiff became aware of Detective Mason's actions, and confronted Detective Mason.  There are several partially divergent accounts of the following interaction between Plaintiff and Detective Mason.

According to James Kowalczyk, Plaintiff was questioning Detective Mason's authority, and Detective Mason continued to examine Plaintiff's Crown Victoria.  (Kowalczyk Dep. 90.)  Then, at some point, Detective Mason turned his camera from Plaintiff's car and attempted to take a picture of Plaintiff himself.  In Mr. Kowalczyk's words:

> Luke is turning his hand left to right blocking the view of the camera and telling Mason to get out of his yard.  Mason is still saying no . . . And they walk toward the mailboxes, Mason walking backwards still trying to take a

Mason was alerted and confronted Mr. Kowalczyk at the shoe store, informing him that he was going to follow Mr. Kowalczyk back to his house.  (Kowalczyk Dep. 65-68, 86 (Docs. # 56-2, 66-1).)

[2]  The testimony and evidence suggests that Detective Mason did not have a search warrant.

> picture . . . And they probably got five feet away from the road in the grass in
> Luke's yard.  Maybe seven feet.  And all of a sudden, Mason changes from
> trying to take a picture to tackling Luke.

(Kowalczyk Dep. 94-95, 98.)  Importantly, Mr. Kowalczyk continued with his observations

on Deputy Moore's involvement.  As Plaintiff and Mason went to the ground, Plaintiff

screamed, which caused his dog (named "Princess") to rush to his defense.  In short, "there

was a lot of commotion."  (Kowalczyk Dep. 159.)  "And when all that happened, that deputy

[Deputy Moore] heard it.  He heard the screaming, so he ran over there . . . [a]nd that's when

. . . Luke got tased."  (Kowalczyk Dep. 99.)  Mr. Kowalczyk spoke with Deputy Moore

shortly after the incident, and Deputy Moore told him that "[Princess] bit him.  He said that

he didn't see what went on.  He didn't see Luke hit Mason."  (Id. at 159-60.)

Plaintiff's wife, Angela McCaw, was also present.  When asked to describe what she

observed, she said:  "[Mason] was on top of him first.  Then his partner ran over there and

got on top of Luke.  And then the Dale County Sheriff [Moore] came running over and got

on top of him and tased him a couple of times."  (McCaw Dep. 57 (Doc. # 53-4).)  According

to Ms. McCaw, Plaintiff was "[f]ace down with his hands underneath – with his arms

underneath him" when he was tased.  (Id.)

Another witness to the incident was Shantell Griffin, Mr. Kowalczyk's wife.

Although her memory of the evening was admittedly quite foggy,[3] Ms. Griffin did remember

---

[3] When asked about her memory generally, Ms. Griffin conceded that she did not have a
very good memory, possibly due to years of illegal narcotic use.  (Griffin Dep. 69-74.)  In fact,
her memory problems are so severe that she stated:  "sometimes I remember – can't remember
my own age."  (Id at 74.)

that there was a lot of commotion.  (Griffin Dep. 69 (Doc. # 56-6).)  She also related that her husband, Mr. Kowalczyk, recorded the incident with a cell phone video camera.  (Griffin Dep. 68.)  However, that recording is now lost.  (Kowalczyk Dep. 109-110 ("I think when all that had first happened, I did have a cell phone in my hand and I was recording it.  But it's been broken and destroyed now . . . I think it was probably maybe a month later [when the phone was destroyed].  I've gone through 30 phones since then.").)

Plaintiff himself was present, of course.  According to Plaintiff, the incident began when he "saw a strange gentleman standing in the yard yelling at my wife [Ms. McCaw]." (Pl. Dep. 67 (Doc. # 56-1).)   After questioning Mason's identity and not receiving satisfactory answers, Plaintiff requested that Mason leave his property.  (Id.)  Mason backed off and then re-entered the property several times.  When Mason re-entered Plaintiff's property for the third time to take photographs of Plaintiff's Crown Victoria, Plaintiff "approached him."  (Id. at 69.)  At this point, Mason (at about one foot distance to Plaintiff) turned his camera on Plaintiff, and Plaintiff raised his hand and "attempted to shield the flash which was directly in [his] vision.  And at that point, he grabbed me and threw me to the ground."  (Id. at 70.)  The next thing Plaintiff recalled was being "tased in the buttocks."  (Id. at 71.)  After being tased once, Plaintiff was handcuffed.  (Id. at 71-72.)

On the other side of the dispute, the two EPD officers (Mason and Breed) and Deputy Moore were present.  Lt. Breed recounted his recollection of the event in a sworn declaration:

> Mason attempted to take a picture of the male subject, Mr. Manning.  The subject attempted to knock the camera from Investigator Mason's hand, but

struck Investigator Mason on the hand and the face in the process.  Investigator
Mason took the subject to the ground.  The subject continued to physically
restrict handcuffing by refusing to allow Investigator Mason to pull his hands
behind his back.  [Deputy Moore] tased the subject, which enabled Investigator
Mason and the deputy to handcuff the subject.

(Breed Decl. at 1.)

Detective Mason also submitted a sworn declaration.  He stated that Plaintiff became

"verbally aggressive" when he tried to advise him of why he was there.  According to Mason,

Plaintiff "[got] in [his] face" as he photographed Plaintiff's vehicle, and when Mason

attempted to photograph Plaintiff, Plaintiff "slapped my hands causing my camera to fall to

the ground at that time.  I did a takedown of the subject.  Deputy Moore then had to [tase]

Mr. Manning in an attempt to control [him]."  (Mason Decl. (Doc. # 53-7).)  Once under

control, Plaintiff was handcuffed.  (Id.)

Deputy Moore submitted a sworn affidavit relating his experience of the incident.

When Deputy Moore arrived, he "observed [Plaintiff] and his wife . . . acting in an abusive

and belligerent manner toward [Mason] and [Breed]."  (Moore Aff. 1.)  After seeing to other

aspects of the situation, Deputy Moore's attention was recalled to Plaintiff and Mason

when I heard an object hit the ground.  I turned towards the sound and saw
Detective Mason and Mr. Manning going to the ground engaged in a struggle.
Mr. Manning was on top of Detective Mason and had his arm around
[Mason's] neck.  I ran over . . . shouting to Mr. Manning to let go . . ., but he
did not comply.  I then . . . [t]ased Mr. Manning one time . . . I quickly helped
Detective Mason get up and as I did, Mr. Manning got up and began to walk
towards his dog, [which] was tied up in the yard and barking loudly.  I
followed Mr. Manning, directing him to stop and I attempted to subdue him
but he continued to pull away from me.  Mr. Manning refused to comply with
my instructions to stop and continued to walk away.  As I was trying to stop

> Mr. Manning and place him in handcuffs, his dog came up and bit me.  The
> dog bite pulled my attention away from Mr. Manning, who continued to walk
> away.  At that point, Detective Mason came up and got Mr. Manning to the
> ground and I was able to handcuff him.

(Mason Aff. 2.)

Finally, there is a videotape of the incident.[4]  (Video (Doc. # 53-8).)  The video (which also contains audio) was being recorded initially by Plaintiff himself, and commences in earnest mid-takedown at the 00:22 second mark, when Plaintiff presumably dropped the camera.  Although it does not show much of anything visually at first, the following audio exchange occurred:

00:22:  [Voice] "Hey!"
00:23-24:  [Voice]  "Don't touch me, man!"
00:24:  [Voice]  "You're under arrest!"

A few seconds later, Plaintiff lets out an ear-piercing shriek and then shouts, "Let go!" or "Let go of it!" several times.  (Video at 00:26-34.)  Meanwhile, another voice can be heard saying, "Watch my back right here."  (Id. at 00:29-30.)  At this point, the video clears up. The camera itself is on the ground on its side, and shows a hand clasping another hand in the grass for a ten second duration.  (Id. at 00:32-42.)  During this time, several voices (most

---

[4]  The Court agrees with Mr. Kowalczyk's assessment of the video's cinematographic quality.  (Kowalczyk Dep. 115 ("I think she didn't really have it pointed in the right spots.").) However, the video does contain a full audio account of what occurred, along with some decipherable video, and therefore gives an adequate account of the encounter.  "Where the video (and audio) obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account."  *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372 (2007)); *see also Lewis v. Blue*, 774 F. Supp. 2d 1164, 1172 n.8 (M.D. Ala. 2011) (Watkins, J.).

likely Mr. Kowalczyk and Ms. McCaw) state or attempt to confirm that Mason tried to hit Plaintiff.  (Id.)

At the 00:45 second mark, the officers get up, and Plaintiff (holding the camera at this point) can be heard saying, "I didn't touch you."  (Id.)  A few seconds later, an officer says, "quit resisting."  (Id. at 00:47-48.)  Plaintiff retorts that he's "not resisting."  (Id.)

The camera changes hands when Plaintiff says to Ms. McCaw, "Honey, take this camera and record this shit."  (Video at 00:49-52.)  A few moments later, once everyone is standing, the video clearly shows Plaintiff attempt to pull away from one of the officers. (Video at 00:56-57.)  Plaintiff yells, "get off of me, shit," and Ms. McCaw shouts to Plaintiff, "Luke, stop!"  (Video 00:57-01:01.)  Plaintiff and the officers go to the ground again. Princess, Plaintiff's dog, rushes to Plaintiff's defense and bites Deputy Moore.  (Id. at 01:06-13; Moore Decl. 2.)  Plaintiff is finally handcuffed at the 01:36 mark.  (Id.)

## IV.  DISCUSSION

There are several factual disputes in the above-recited narrative; however, none of these are material disputes as to Deputy Moore's involvement, as discussed below.[5]

## A.    <u>Spoliation</u>

Before discussing the substantive claims, the Court will address Deputy Moore's spoliation argument, which is that Plaintiff's failure to turn over the video recorded by Mr.

---

[5]  Deputy Moore is the lone defendant remaining in the case.  (See Doc. # 47 (dismissing on joint motion all claims against Mason, Breed, and the City of Enterprise with prejudice).)

Kowalczyk on his cell phone constitutes spoliation, and thus warrants dismissal of the case. (Br. in Support 6 (Doc. # 52).)

A party moving for sanctions for spoliation "must establish, among other things, that the destroyed evidence was relevant to a claim or defense such that the destruction of that evidence resulted in prejudice." *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010). Here, although a second video would have been relevant to the case, it is likely that Plaintiff is not prejudiced by not having it. Mr. Kowalczyk testified that he watched the video he took of the incident shortly thereafter, and concluded that it was not important:

> And I know the reason I wasn't that worried about the video part, why I didn't copy it or anything, is after watching the video, it was a crappy cell phone. You couldn't really hear the words, and the video wasn't good. And it wasn't really pointed on them or nothing.

(Kowalczyk Dep. 113.) In short, Mr. Kowalczyk testified that the video he took held no evidentiary value due to its poor quality.

Moreover, Mr. Kowalczyk testified that the phone broke accidentally about a month after the incident, and that he did not destroy the video contained on the phone on purpose. (Kowalczyk Dep. 109.) "An adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Sec. & Exch. Comm'n v. Goble*, 682 F.3d 934, 948 (11th Cir. 2012) (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)). Deputy Moore has presented no evidence that Mr. Kowalczyk

(at Plaintiff's behest) destroyed his phone so as to prevent the video's use in future litigation. Accordingly, Deputy Moore's spoliation claim is due to be rejected.

## B.     Plaintiff's Federal Claims Against Deputy Moore

To establish § 1983 individual liability, a plaintiff must demonstrate that (1) he was deprived of a right secured by the United States Constitution or a federal statute, and (2) the act or omission causing the deprivation was committed by an individual acting under color of state law. *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987).

Plaintiff has sued Deputy Moore in his individual capacity only (Mem. Op. 3 (Doc. # 40)), and Deputy Moore has invoked the defense of qualified immunity. (Br. in Support 16.) "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee*, 284 F.3d at 1193-94. The doctrine aims to focus government officials on "'their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Hoyt v. Cooks*, 603 F.3d 972, 977 (11th Cir. 2012).

The examination of a qualified immunity defense involves a three-part analysis. First, the officer must establish that he was performing discretionary acts, which is undisputed in this case. At this point, the court must grant the defendant officer qualified immunity unless

the facts taken in a light most favorable to the plaintiff show (1) that there was a violation of the Constitution or federal law and (2) that the illegality of the officer's actions was clearly established at the time of the incident.  In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court instructed the lower federal courts to use sound discretion to decide which of these two prongs to address first.

A determination of whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a general proposition." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).  In other words, "[f]or an asserted right to be clearly established for purposes of qualified immunity, 'the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law.'" *Jackson v. Sauls*, 206 F.3d 1156, 1164-65 (11th Cir. 2000) (quoting *Lassiter v. Ala. A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994)).  "The burden of showing that an officer violated clearly established law falls on the plaintiff, and a plaintiff's citation of general rules or abstract rights is insufficient to strip a § 1983 defendant of his qualified immunity." *Id.* The requisite clarity is to be gleaned from case law of the Supreme Court of the United States, the Eleventh Circuit, and the Supreme Court of Alabama. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (*en banc*).  "[I]f [the] case law, in factual terms, has not staked out a bright

line, qualified immunity almost always protects the defendant." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000).

### 1.      *Excessive Force (Count 1)*

The Fourth and Fourteenth Amendments protect criminal suspects from the use of unreasonable force during a seizure by state actors, and such a claim is analyzed under the reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388-95 (1989); *see also Lee*, 284 F.3d at 1197.  The reasonableness inquiry requires the court to "carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing interests at stake.'" *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).  As a balancing test tightly yoked to the facts of a particular case, the Fourth Amendment reasonableness inquiry "is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

In evaluating the reasonableness of the force applied, the Court must consider the fact pattern "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and [must] balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).  In *Graham*, the Supreme Court listed several guiding factors that have formed part of the Fourth Amendment calculus:  (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or

14

others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (quotation omitted); *see also Graham*, 490 U.S. at 396.

"The reasonableness standard of the Fourth Amendment necessarily offers a wide channel for successful navigation of the variegated encounters between law enforcement and civilians." *Hargrove v. City of Montgomery*, No. 10cv294, 2012 WL 917293, at *8 (M.D. Ala. Mar. 19, 2012) (Fuller, J.). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. A reviewing court also must be mindful of its proper role in evaluating excessive force claims: "Not every push or shove, even it if may later seem unnecessary in the peace of judge's chambers" violates the Fourth Amendment. *Graham*, 490 U.S. at 396; *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (cautioning against employing "the 20/20 vision of hindsight"). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396.

The undisputed material facts – as they relate to Deputy Moore – are that Plaintiff (who was a potential felony suspect) and Mason were exchanging unfriendly words. Plaintiff was waiving his hands in the air attempting to block Detective Mason from taking his

picture.  Deputy Moore was aware of the unpleasantries, but had turned his attention away from the pair briefly.  However, when he heard the commotion, he turned back and saw Plaintiff and Mason going to the ground; responding hurriedly, Deputy Moore rushed over and used his taser once in an attempt to cut short any further scuffling on the ground.  The video reveals that the tase (based upon Plaintiff's scream) occurred approximately three to four seconds after Plaintiff and Mason went to the ground, giving Deputy Moore very little time to gauge who had the upper hand in the struggle.  After being tased, Plaintiff attempted to get away from being handcuffed (as depicted in the video), and was taken to the ground again and finally secured.

The Eleventh Circuit has reasoned that "the use of tasers or other weapons does not violate the Fourth Amendment *per se*."  *Fils*, 647 F.3d at 1289.  Rather, it has expressly upheld an officer's single use of a taser gun causing a one-time shocking as a reasonably proportionate use of force to bring an individual under control when that individual (who was pulled over for a minor traffic infraction) became belligerent, hostile, and uncooperative. *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004).  Although the plaintiff in *Draper* never became physically combative, his wild gesturing, obvious excitement, and verbal abuse of the officer justified the officer's deployment of his taser because it "may well have prevented a physical struggle and serious harm to either [the plaintiff] or [the officer]."  *Id.*

Deputy Moore's use of his taser against Plaintiff is indistinguishable from the officer's use of his taser in *Draper*, and indeed justified for the same reasons.  Deputy Moore was

16

faced with an undisputably tense situation.  When an officer and a suspect go to the ground, there is significant potential for serious injury to result to either or both participants. Balancing that risk against a single use of a taser on a relatively safe area of the body (the buttocks, in this case), the Court concludes, based upon the totality of the circumstances, that the use of force was reasonably proportionate to Deputy Moore's perception of the incident.

None of Plaintiff's case citations even remotely approach the level of factual similarity presented in *Draper*.  In several of the cases (*Vinyard v. Wilson* and *Lee v. Ferraro*), the plaintiffs were handcuffed and secured when the excessive force was applied; in another (*Priester v. City of Riviera Beach*), the officer was faced with a compliant burglary suspect who voluntarily followed all commands, including lying face down on the ground, and then allowed his police dog to attack the plaintiff for at least two minutes.  Finally, in one other case (*Sheth v. Webster*), the officer made a racist comment to a hotel owner of Indian descent who was not accused or suspected of any crime.  When she took exception verbally, the officer became enraged, shoving and pushing the plaintiff, and kneeing her in the stomach.  These cases are quite obviously distinguishable on their facts.

In reliance on *Draper*, the Court readily concludes that Deputy Moore's use of his taser once against Plaintiff in the circumstances presented was not excessive force in violation of the Fourth Amendment.[6]  Thus, the Court need not address the "clearly

---

[6] Finally, even assuming that Mr. Gormley, Plaintiff's expert, is qualified to testify as an expert concerning the use of force, his conclusory opinion (conclusory both in fact and law) is insufficient to create genuine issue of material fact in this case.

established" aspect of Plaintiff's excessive force claim, and Defendant Moore is entitled to summary judgment on that claim.

### 2.     *Unlawful Arrest (Count 2)*[7]

"While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). Rather, in examining a law enforcement encounter that implicates the Fourth Amendment in a § 1983 action where the officer has invoked qualified immunity, the officer need not prove that probable cause existed as a matter of fact. *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003). Rather, the officer need only have an *arguable* basis for the seizure. The Eleventh Circuit defines an arguable basis as when "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant[ ] could have believed that probable cause existed to arrest [the] [p]laintiff." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004).

Here, Plaintiff ultimately was arrested for Assault (Second Degree), Resisting Arrest, and Obstructing Governmental Operations. (Docs. # 56-3, -4.) He claims that his arrest on these charges, absent probable cause, violated the Fourth Amendment.

---

[7] Plaintiff's Second Amended Complaint does not make clear whether Count 2 is a § 1983 and Fourth Amendment unlawful arrest claim or whether it is an Alabama state law claim for false arrest. Deputy Moore's brief treats it as a state law claim only, and Plaintiff's one short paragraph devoted to the claim(s) in his brief in opposition does not clear up the ambiguity. The Court will assume that Plaintiff has asserted both the federal and Alabama claims out of an abundance of caution.

Construing the facts in a light most favorable to Plaintiff, it is quite clear that there was no *actual* probable cause to arrest Plaintiff for any of these crimes.  Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  One of the elements required for an Alabama second-degree assault conviction is that the perpetrator actually have caused "physical injury" to the victim. *Ala. Code* § 13A-6-21.  In this case, there is a genuine factual dispute about whether Plaintiff's hand actually touched Detective Mason. (*Compare* Mason & Breed Decls. *with* Pl. Dep. 70.)  Crediting Plaintiff's narrative, no observer of that exchange could have concluded that Plaintiff committed a second-degree assault when Plaintiff made no contact whatsoever with Detective Mason.  Moreover, Plaintiff's version of the facts suggests that he lacked the requisite intent to cause physical injury, even if he did accidentally strike Mason while attempting to shield himself from Detective Mason's camera. (Pl. Dep. 70.)  For these reasons there was no *actual* probable cause to arrest Plaintiff for second-degree assault.

Moreover, there was no *actual* probable cause to arrest Plaintiff for resisting arrest or for obstructing governmental operations.  Under Alabama law, a person commits the misdemeanor of resisting arrest if "he intentionally prevents or attempts to prevent a peace officer from affecting a *lawful* arrest of himself or of another person." *Ala. Code* § 13A-10-41 (emphasis added).  Similarly, a person obstructs governmental operations under Alabama law when, "by means of intimidation, physical force or interference or by any other

19

independent unlawful act, he (1) [i]ntentionally obstructs, impairs or hinders the administration of law or other governmental function; or (2) [i]ntentionally prevents a public servant from performing a governmental function." *Ala. Code* § 13A-10-2.   A "governmental function" is defined as "[a]ny activity which a public servant is *legally authorized* to undertake on behalf of a government." *Ala. Code* § 13A-10-1 (emphasis added); *see also A.A.G. v. State*, 668 So. 2d 122, 126 (Ala. Crim. App. 1995).   Accordingly, it follows that for both resisting arrest and obstructing governmental operations, the arrest or governmental operation, respectively, must be lawfully undertaken by the police officer or government agent.

Construed in a light most favorable to Plaintiff, the evidence reveals that Detective Mason was neither making a lawful arrest nor were his actions legally authorized.   Because resisting arrest itself is exempt from the crime of obstructing governmental operations, § 13A-10-2(b) ("This section does not apply to the obstruction, impairment or hindrance of the making of an arrest"), Plaintiff's obstruction of governmental operations arrest, by process of elimination, could only relate to Detective Mason's impersonation of a peace officer investigation.   However, the undisputed facts are that Detective Mason lacked a search warrant, and continued to re-enter Plaintiff's property after Plaintiff demanded that he leave. (Pl. Dep. 68-69.)   Detective Mason's repeated re-entries onto Plaintiff's property were not "legally authorized" activities for purposes of the statute.   *See Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998) (stating that "once [the unlawful arrest plaintiff-

resident] had asked the officers to leave [his property], their continued presence . . . was not pursuant to their official duties and was outside of their authority").  In short, Plaintiff was well within his rights to demand that Detective Mason exit his property absent a search warrant, and whatever obstruction he mounted to Detective Mason's continued investigative efforts was not chargeable as obstructing governmental operations since Detective Mason's activities were not legally authorized.

Moreover, Alabama law allows a person to resist an unlawful arrest.  *Sanders v. State*, 61 So. 336 (Ala. 1913) (stating that "an attempt unlawfully to arrest gives the person sought to be arrested a right to resist"); *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1229 (Ala. 2002) ("The law in Alabama is clear that, to a limited degree, a party is justified in attempting to resist an unlawful arrest.  A party may use reasonable force to extricate himself from an unlawful arrest." (internal citations omitted)).  Detective Mason's only justification for arresting Plaintiff would be for second-degree assault or obstructing governmental operations, but as discussed above, there was no probable cause to arrest Plaintiff for either of those charges.  Relatedly, a person may only be convicted of resisting arrest if the initial arrest was lawful.  § 13A-10-41.  Because the initial arrest was unlawful, Plaintiff both had a right to resist the arrest and also could not be convicted for resisting arrest.  Thus, there was no *actual* probable cause to arrest Plaintiff for resisting arrest.

However, in assessing whether Deputy Moore had *arguable* probable cause to arrest Plaintiff (it is also unclear whether Deputy Moore was even involved in the arrest, since he

21

only was present in a back-up role), the Court must assess whether a "reasonable officer 'could have believed that probable cause existed.'"   *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1558 (quoting *Moore v. Gwinnett Cnty.*, 967 F.2d 1495, 1497 (11th Cir. 1992)).

Because all of these are arrestable offenses, it necessarily follows that Deputy Moore need only show that arguable probable cause existed to arrest Plaintiff on any one of these offenses.  *See Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (finding that defendant-officers lacked arguable probable cause for charged crime of obstruction, and further noting that "none of the officers suggests that [the plaintiff] committed any other crime").

Here, the undisputed facts, as discussed above, are that Deputy Moore did not witness the exchange that brought Plaintiff and Detective Mason to the ground.  His attention was only called to the fracas after the fact.  Therefore, in assessing whether Plaintiff had committed a second-degree assault against Detective Mason, Deputy Moore was in the position of having to rely on the conflicting stories presented by each side of the dispute. The video reveals that both Plaintiff and his witnesses were claiming that Detective Mason struck Plaintiff first (Video at 01:36 (voice exclaiming, "He hit Luke first"), while both Mason and Breed were claiming that Plaintiff struck Mason first (Video at 02:02 ("That's fine, he [Plaintiff] put his hands on him [Mason]") and at 02:16 (Mason stating that "he put his hand on my hand"); *see also* Breed and Mason Decls.).  A reasonable officer is entitled to believe another officer's version of events in effectuating an arrest.  Stated another way,

Deputy Moore's belief that probable cause existed to arrest Plaintiff for second-degree assault was reasonable based upon Mason's and Breed's accounts of what happened.

Because Deputy Moore had arguable probable cause to arrest Plaintiff (assuming he even arrested Plaintiff at all) for second-degree assault based upon the totality of the circumstances, Deputy Moore is entitled to qualified immunity on Plaintiff's § 1983 unlawful arrest claim.

**C.**     **Plaintiff's State Claims Against Deputy Moore**

In addition to the federal claims discussed above, Plaintiff brings the following state law claims against Deputy Moore: false arrest (Count 2); trespass (Count 3); assault and battery (Count 4); intrusion upon seclusion (Count 5); negligence (Count 6); wantonness (Count 7); and loss of consortium (Count 8, a claim belonging to Plaintiff McCaw).  As a deputy sheriff acting within the line and scope of his duties as a deputy sheriff, Deputy Moore is entitled to absolute immunity on all of these state law claims.

The law is well established in Alabama that, pursuant to Article I, Section 14 of the Alabama Constitution, sheriffs and deputy sheriffs enjoy absolute immunity when "acting within the line and scope of their employment." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1431 (11th Cir. 1998); *Tinney v. Shores*, 77 F.3d 378, 383 (11th Cir. 1996).  This immunity is not limited to claims of negligence and it applies to claims against deputy sheriffs and sheriffs in both their official and individual capacities.  *Tinney*, 77 F.3d at 383 n.3; *see also Ex parte Davis*, 930 So. 2d 497, 500 (Ala. 2005) ("The wall of immunity erected by § 14 is

nearly impregnable . . . and bars . . . claims against a state official or employee sued in his official capacity as an agent for the State, and [ ] claims against a state official or employee sued in his individual capacity." (internal quotation marks, footnotes, and citations omitted)).

Thus, "[s]o long as a sheriff or deputy sheriff acts within the scope of his or her employment, immunity exists with respect to state-law claims, even for willful or malicious actions." *Harrington v. City of Phenix City*, No. 10cv1048, 2012 WL 204168, at *7 (M.D. Ala. Jan. 24, 2012) (Watkins, C.J.) (citing *Ex parte Davis*, 930 So. 2d at 501).

Here, Plaintiff has made no argument nor presented any evidence that would suggest that Deputy Moore's actions were not within the scope of his employment as a deputy sheriff. Nor could he: There is simply nothing in the record that would suggest anything out of line on Deputy Moore's part. Thus, Deputy Moore is entitled to absolute immunity with respect to all of Plaintiff's (and Plaintiff McCaw's) state law claims, in accordance with Article I, § 14 of the Alabama Constitution.

## V.  CONCLUSION

Accordingly, it is ORDERED that Defendant Moore's Motion for Summary Judgment (Doc. # 51) is GRANTED and judgment is due to be entered in Defendant Moore's favor on all of Plaintiffs' claims. It is further ORDERED that Defendant's *Daubert* motion (Doc. # 60) is DENIED as moot.

An appropriate final judgment will be entered.

DONE this 6th day of September, 2012.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE

24